[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13085
Non-Argument Calendar
_____

D.C. Docket No. 6:13-cr-00099-JAJ-KRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES FIDEL SOTOLONGO,
STEPHANIE MUSSELWHITE,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 30, 2018)

Before TJOFLAT, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

James Sotolongo and Stephanie Musselwhite (collectively, "Defendants") appeal from the district court's denial of their joint motion for a new trial based on newly discovered evidence and alleged *Brady/Giglio*[1] violations following their convictions by jury of several offenses arising out of a mortgage-fraud conspiracy. Defendants argue that the court abused its discretion by denying their motion and by failing to hold an evidentiary hearing or to allow discovery.   After careful review, we affirm the denial of their new-trial motion.

## I.

We begin with a description of the scheme and some of the relevant evidence, which we take mainly from our opinion affirming their convictions and sentences.  *See United States v. Musselwhite*, 709 F. App'x 958 (11th Cir. 2017).

From 2006 to 2007, James Sotolongo, the finance director at Century Motors Financial in Winter Park and Daytona Beach, Florida, devised a scheme to take advantage of the then-booming real-estate market.  *See id.* at 961.  At that time, property values were quickly escalating and "[p]roperties were being purchased, sold, relisted, and resold at a high volume."  *Id.*

Sotolongo's scheme involved using straw buyers with good credit scores to obtain expensive residential real estate, which he planned to rent out for several years and then resell for a huge profit.  *Id.* at 961–62.  The straw buyers, including

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

Abdul "Jack" Rifai, the owner of Century Motors, submitted loan applications containing false statements, which four FDIC-insured banks relied upon in agreeing to fund the mortgage loans. *Id.* at 962. The closing documents likewise contained false statements the banks relied upon in disbursing the loan funds. *Id.*

Christopher Mencis was the mortgage broker for all but one of the seven properties charged in the indictment. *Id.* Mencis and his company helped line up financing and aided with the preparation of loan applications. The straw buyers' loan applications generally contained significant false statements involving matters such as their annual earnings, their jobs, and the purpose for which the property was being purchased. *Id.*

Sotolongo, Mencis, the straw buyers, and the banks participated in closings overseen by title agent Stephanie Musselwhite. *Id.* When a lender is involved in the transaction, the title agent, also known as the closing agent, is responsible for preparing settlement statements in compliance with the lender's closing instructions. Musselwhite assisted the fraud by preparing settlement statements that falsely represented that her title company had received deposits and cash to close from the borrowers at or before closing, when in fact no deposits or transfers had been made. Once the banks disbursed the mortgage-loan funds, those funds were used to satisfy the straw buyers' deposit and cash-to-close obligations. *Id.*

3

Sotolongo, Musselwhite, Mencis, and one other person were indicted for their roles in the mortgage-fraud scheme in April 2013.  Count 1 charged all four with having conspired, in violation of 18 U.S.C. § 371, to make false statements to FDIC-insured financial institutions, in violation of 18 U.S.C. § 1014, and to commit bank fraud, in violation of 18 U.S.C. § 1344.  Counts 2 through 12 charged Defendants Sotolongo and Musselwhite with substantive executions of a bank-fraud scheme, in violation of § 1344.  Count 13 charged Mencis with making false statements to an FDIC-insured financial institution.  And Count 14 charged Sotolongo, Musselwhite, and the other person with having made a false statement to an FDIC-insured financial institution.  Mencis pled guilty to the § 1014 charge and cooperated with the government.  Rifai, who was not charged for his role as a straw buyer for three of the seven properties, also cooperated.

Defendants denied guilt and proceeded to trial, which took place in April 2014.  Mencis and Rifai testified for the government.  The jury acquitted Defendants of a few charges but found them guilty of most others.[2]  The district court entered judgment in February 2015, sentencing Sotolongo to a total term of 100 months in prison and Musselwhite to a total term of 60 months in prison.

---

[2]  More precisely, the jury returned a guilty verdict against Musselwhite on Counts 1, 4 through 12, and 14, and against Sotolongo on Counts 1 through 12. The jury acquitted Musselwhite on Counts 2 and 3 and Sotolongo on Count 14.

4

Defendants appealed their convictions, raising a variety of challenges, including the sufficiency of the evidence to support their convictions. After hearing oral argument, we rejected these challenges and affirmed their convictions. 709 F. App'x at 978.

## II.

In April 2017, while their direct appeals were pending, Defendants filed in the district court a joint motion for a new trial based on newly discovered evidence and alleged *Brady/Giglio* violations. They claimed that, well after the trial, they learned of "significant impeachment evidence" pertaining to both Mencis and Rifai. They argued that this new evidence undermined their convictions, that the government violated *Brady* by failing to disclose it, and that the government violated *Giglio* by knowingly offering or failing to correct false testimony.

With regard to Mencis, Defendants learned that he had participated in illegal gambling activity with an individual named Christopher Tanner during the same period of the mortgage-fraud scheme (2006–07). Tanner was indicted along with other individuals in 2013 in the Western District of Oklahoma on charges of racketeering, conducting an illegal-gambling business, and money laundering. Mencis testified for the government at Tanner's trial in February 2015. Without citing to Mencis's testimony in the *Tanner* case or to any other evidence, Defendants asserted that Mencis was a "likely or possible" target of that

5

prosecution.    They claimed that, without knowledge of Mencis's additional criminal activity and cooperation, the defense was unable to determine whether Mencis's testimony for the government in both cases would result in additional actual or perceived benefit over and above that specified in his plea agreement in this case.

With regard to Rifai, Defendants learned that he was never charged for his conduct in this case, contradicting Rifai's and the government's assurances at trial that charges would be forthcoming.  Defendants claimed that, due to the applicable statute of limitations, Rifai had effectively been granted immunity for his crimes. They maintained that the government was required either to disclose the existence of any such immunity agreement or to correct the misleading testimony once the government decided not to prosecute him.  They argued that the decision not to prosecute Rifai was highly material because it would have either established the magnitude of his incentive to testify or undermined the government's case that the activity Rifai engaged in with Defendants was criminal.

Defendants requested an evidentiary hearing and the opportunity to conduct discovery regarding the government's knowledge of the Mencis evidence and its handling of the Rifai non-prosecution.  The government filed a response in opposition to the joint motion, attaching an FBI 302 report documenting what

6

appears to be an initial interview with Mencis for the *Tanner* case on July 2, 2014, over two months after the trial in this case.

The district court denied Defendants' joint new-trial motion.  The court concluded that the evidence of Mencis's unrelated gambling activity was merely impeaching, not material, and likely would not have produced a different result.  As for the Rifai evidence, the court likewise found that it was merely "additional impeachment evidence" that was not material and would not produce a different result.  Regarding the alleged *Brady/Giglio* violations, the court found that no evidence was suppressed because the government was not aware of the Mencis evidence before trial and because Rifai's status as unindicted coconspirator remained unchanged after the trial.  Finally, the court denied an evidentiary hearing, noting that it was well-equipped to rule on the motion without an evidentiary hearing because it had heard and evaluated the trial testimony of both Mencis and Rifai.  Defendants now appeal.

### III.

We review for an abuse of discretion the district court's denial of a motion for a new trial, whether that denial is based on newly discovered evidence or on a *Brady*/*Giglio* violation.  *See United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002).  We likewise review the denial of an evidentiary hearing for an abuse of discretion.  *United States v. Massey*, 89 F.3d 1433, 1443 (11th Cir. 1996).  In

reviewing for an abuse of discretion, we will affirm unless the district court made a clear error of judgment or applied the wrong legal standard. *United States v. Lyons*, 403 F.3d 1248, 1255 (11th Cir. 2005).

## IV.

The Federal Rules of Criminal Procedure permit the district court to vacate a judgment and grant a new trial "if the interest of justice so requires," including where newly discovered evidence casts doubt on the validity of a conviction. Fed. R. Crim. P. 33(a), (b)(1). Motions for a new trial are "highly disfavored" and should be granted only with great caution. *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013). An evidentiary hearing on a Rule 33 motion is not required where "the record contain[s] all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial." *Id.* at 1305 n.30.

To obtain a new trial based on newly discovered evidence, the movant must establish all of the following: (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to a lack of due diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial would probably produce a different result. *United States v. Barsoum*, 763 F.3d 1321, 1341 (11th Cir. 2014). "The failure to satisfy any one of these elements is

8

fatal to a motion for a new trial." *United States v. Schlei*, 122 F.3d 944, 991 (11th Cir. 1997) (quoting *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995)).

To obtain a new trial based on a *Brady* violation, the defendant must show all of the following:  (1) the government possessed evidence favorable to the defendant; (2) the defendant did not possess that evidence and could not have possessed the evidence with due diligence; (3) the government suppressed the evidence; and (4) there was a reasonable probability of a different outcome if the evidence had been disclosed to the defendant.  *Vallejo*, 297 F.3d at 1164.

In order to establish a *Giglio* violation, "the defendant must demonstrate that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." *Id.* at 1163–64 (quotation marks omitted).  The materiality element is met if there is "a reasonable likelihood the false testimony could have affected the judgment of the jury."  *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010).

Here, the district court did not abuse its discretion by denying Defendants' joint motion for a new trial.  First, the court reasonably concluded that the Mencis and Rifai evidence did not meet the requirements of a Rule 33(b)(1) motion for a new trial based on newly discovered evidence.

With respect to Mencis, the evidence that he may have been involved in contemporaneous, unrelated criminal activity and that he later testified for the

government in a separate case "at most would merely have impeached [Mencis]," which is not sufficient to grant a new trial. *See Garcia*, 13 F.3d at 1471–72 (evidence that a government witness was a suspect in an unrelated murder investigation at the time of the defendant's trial was "at most" merely impeaching); *United States v. Champion*, 813 F.2d 1154, 1171 (11th Cir. 1987) ("Newly discovered impeaching evidence is insufficient to warrant a new trial."). Nor was this evidence of such a nature that a new trial would probably produce a different result. The fact that Mencis testified for the government in another case does not, on its own, show that he was a "likely or possible target" of the investigation. Appellants offered no evidentiary support for that contention, such as a trial transcript, and the FBI 302 report indicates that Mencis simply placed sports bets through one of the defendants. Plus, as the district court noted, Mencis was subject to vigorous cross-examination during trial. Accordingly, the district court properly denied a new trial on this ground.

Likewise, the district court did not abuse its discretion in finding that the Rifai evidence did not meet the requirements for a new trial under Rule 33(b)(1). Evidence that Rifai ultimately was not charged is merely impeaching and would not have affected the outcome of the trial. While Rifai was befuddled at trial as to whether he had been charged, the parties clarified the matter by stipulating to the jury that there was no agreement that Rifai would be charged and that no charges

10

were pending.  As the district court found, the jury could readily infer that Rifai was an unindicted coconspirator who testified against Defendants in "an attempt to curry favor with the government to avoid prosecution."  That Rifai ultimately was not charged does not change his status at the time of trial in any material way. There is nothing to suggest that the government, at the time of trial, did not actually intend to bring charges against Rifai at a later time.  And Defendants had a full and fair opportunity to cross-examine Rifai and portray him as someone who effectively cut a deal with the government in exchange for his testimony. Defendants have not shown that the district court made a clear error of judgment in denying a new trial on this ground.

Second, the district court properly denied a new trial based on the government's alleged failure to disclose the Mencis evidence.  The government did not suppress favorable evidence in violation of *Brady* because the prosecution in Defendants' case first became aware of Mencis's involvement in the other case in August 2015, over a year after Defendants' trial.  In fact, Mencis was first interviewed by the FBI about his gambling activity in July 2014, over two months after Defendants' trial.  Because the government did not possess the Mencis evidence before or at the time of trial, it could not have suppressed evidence favorable to Defendants.  *See Vallejo*, 297 F.3d at 1164.

11

Without disputing this timeline, Defendants maintain that the government knew or should have known about Mencis's gambling activity before trial. But they offer nothing more than speculation to support that claim. *See United States v. Jordan*, 316 F.3d 1252 n.81 (11th Cir. 2003) ("[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'"). In any case, even if the government knew that Mencis had placed illegal sports bets in the past—it would not have known of his cooperation in the *Tanner* case since his cooperation did not begin until after Defendants' trial—we agree with the district court that there is no reasonable probability of a different outcome if the evidence had been disclosed to him. *See Vallejo*, 297 F.3d at 1164.

Third, the district court properly denied a new trial based on alleged *Brady*/*Giglio* violations with regard to the Rifai evidence. To begin with, we agree with the court that "there is no new nondisclosed evidence present." Defendants knew at the time of trial that Rifai was an unindicted coconspirator, and that status has not changed, even if the possibility of prosecution is now foreclosed. Although Defendants characterize the failure to charge Rifai after the trial as an "effective[]" immunity deal, they do not seriously contend that there was an immunity agreement before or at the time of trial, and the district court found that there was not one. Accordingly, Defendants have not established a *Brady* violation with regard to the Rifai non-prosecution.

12

Defendants respond that the lack of agreement is "legally inconsequential" because "[t]he key question is not whether the government and the witness entered into an effective agreement, but whether the witness might have believed the government was in a position to implement any promise of consideration." *See Napue v. Illinois*, 360 U.S. 264, 270 (1959). But as the district court stated, the jury readily could have inferred that Rifai was an unindicted coconspirator who testified against Defendants in "an attempt to curry favor with the government to avoid prosecution." Rifai's potential motivations in that regard were not concealed from the jury. The court therefore did not err in concluding that the Rifai evidence was not "material," even under the more relaxed standard applicable to *Giglio* violations. *See McNair*, 605 F.3d at 1208.

More fundamentally, Defendants have failed to show that Rifai offered any false testimony that needed to be corrected. *See Vallejo*, 297 F.3d 1163–64; *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) ("The prosecutor obviously has no duty to correct that which is not false."). The jury was given clear information, in the form of a stipulation, that there was no agreement to charge Rifai and that no charges were pending against him. While Rifai's testimony indicated that he expected to be charged, the lack of prosecution does not prove his testimony false or even misleading, nor does it contradict the prosecutor's statement at trial that the government intended to bring charges

13

against Rifai. Defendants were well-equipped to portray Rifai as someone who effectively cut a deal with the government in exchange for his testimony. We therefore cannot conclude that the jury was presented with any false information or impression bearing on Rifai's motivations to testify against Defendants.

Finally, the decision not to hold an evidentiary hearing was well within the district court's discretion. The "acumen gained by a trial judge over the course of the proceedings" makes the court "well qualified" to rule on a motion for a new trial without an evidentiary hearing. *Schlei*, 122 F.3d at 994. The court here presided over Defendants' trial and heard and evaluated the testimony of the witnesses whose credibility is now challenged.

Furthermore, this case does not involve the unique circumstances where we have found evidentiary hearings appropriate. *See United States v. Espinosa-Hernandez*, 918 F.2d 911, 913–14 (11th Cir. 1990) (ordering an evidentiary hearing based on new evidence of serious allegations of misconduct, including false statements, by the case agent in charge of the operation leading to the indictment); *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977) ("Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or

14

third party confession.").[3]    Defendants' allegations and arguments do not raise more than a speculative possibility that the government violated *Brady* or *Giglio* with regard to the Mencis and Rifai evidence.   And post-trial discovery or an evidentiary hearing based upon mere speculation that it could produce helpful information is not appropriate.   See *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1189 (11th Cir. 2006); *Champion*, 813 F.2d at 1171 n.25.

In light of the "highly disfavored" nature of new-trial motions, *Scrushy*, 721 F.3d at 1304, the district court did not abuse its discretion by concluding that the new evidence was merely impeaching and that Defendants failed to show that it probably would change the result of their trial.  The court also did not err in finding that no new trial was warranted based on *Brady/Giglio* violations.   For these reasons, and because the same judge presided over Defendants' trial, the district court was well qualified to rule on their joint motion without a hearing, and it did not abuse its discretion by declining to order discovery.  Therefore, we affirm.

**AFFIRMED.**

---

[3]    We have adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

15