[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10842
_____

D.C. Docket No. 6:13-cr-00099-JAJ-KRS-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEPHANIE MUSSELWHITE,
JAMES FIDEL SOTOLONGO,

Defendants – Appellants,

CHRISTOPHER MENCIS,

Defendant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 22, 2017)

Before WILLIAM PRYOR, MARTIN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Defendants-Appellants James Sotolongo and Stephanie Musselwhite appeal their convictions for conspiring to commit, and committing, mortgage fraud.  After careful consideration, and with the benefit of oral argument, we affirm the convictions of both Musselwhite and Sotolongo.

## I.    BACKGROUND

### A. Facts[1]

Between 2002 and early 2008, the real-estate market was booming, with quickly escalating property values and "irrationally exuberant" investors. Properties were being purchased, sold, relisted, and resold at a high volume, a fact that did not escape the notice of James Sotolongo, the finance director at Century Motors Financial in Winter Park and Daytona Beach, Florida.

From October 2006 through July 2007, Sotolongo devised a scheme to take advantage of this robust real estate market.  Through straw buyers, Sotolongo obtained expensive residential real estate in Florida, rented the properties out for several years, and then resold them for a huge profit.

---

[1] We take these facts from the evidence adduced at trial, which we view in the light most favorable to the government.  *See United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997).

Key to the success of Sotolongo's scheme was his reliance upon his straw-buyer partners and their good credit scores, which Sotolongo needed to obtain certain more favorable loans, such as NINA—no income, no asset—loans[2] and NINJA—no income, no job, no asset—loans, to purchase the properties he used in his scheme.  Sotolongo's partners included his father-in-law, Roger Matson, who was semi-retired and would occasionally attend car auctions on behalf of Century Motors; Matson's grandson, Steve Matson;[3] Abdul "Jack" Rifai, the owner of Century Motors; Sidney Coton, a car salesman at Century Motors; and George Goetz, a carnival worker in Pennsylvania.

Testimony at trial revealed that the scheme operated as follows.  Sotolongo worked with Ramara Garrett, a realtor, to locate suitable properties to purchase.[4] With a specific property in mind, Sotolongo would then direct his straw buyers to Christopher Mencis, a mortgage broker, and Mencis's company, Real Estate Mortgage Professionals ("REMP"),[5] both to line up financing  for the straw buyers and to aid with the preparation of loan applications.  The straw buyers' loan applications generally contained significant false statements involving matters such as their annual earnings, their jobs, and the purpose for which the property was

---

[2]  NINA loans are also known as "stated loans."

[3] To avoid confusion, this opinion occasionally refers to the Matsons by their first names.

[4] Ramara Garrett is not a party to this appeal.  Although she proceeded to trial alongside Sotolongo and Musselwhite, the jury acquitted her on both of the counts for which she was indicted.

[5] Before trial, Mencis pled guilty to one count of falsifying a loan application.  He then testified as a witness for the prosecution at trial.

being purchased.  Based at least in part on these false statements, the FDIC-insured banks—Washington Mutual Bank, Wells Fargo Home Mortgage, JPMorgan Chase, and Bank of America—agreed to fund the mortgage loans.

Sotolongo, Mencis, the straw buyers, and the banks then participated in closings overseen by title agent Stephanie Musselwhite of Orlando Title & Abstract.  When a lender is involved in the transaction, the title agent, also known as the closing agent, is responsible for preparing a HUD-1 settlement statement in compliance with the lender's closing instructions.  The HUD-1 lists all of the fees associated with the transaction as well as all of the terms of the transaction, including the amounts that the borrower and seller each must bring to the closing.

More specifically—and as relevant in this scheme—line 201 of the HUD-1 specifies any deposits that are in place at the time of the contract, including any earnest money being held in escrow, while line 303 lists the money that the buyer must bring to the closing table.  Typically, the money listed in line 303 is either wired to the closing agent before the closing or brought to the closing in the form of a cashier's check.  In other words, all funds are normally present and accounted for at the closing, and only in rare cases (requiring the lender's approval) would the parties exchange funds after the closing has taken place.

Musselwhite prepared HUD-1 settlement statements for each transaction at issue here.  She represented to the lenders that her title company had received

4

deposits and cash to close from the borrowers at or before the closing, which prompted the lenders to release their funds at closing or shortly thereafter. In fact, however, Musselwhite did not receive such funds. Rather, Musselwhite would disburse the money received from the lenders to Sotolongo and companies affiliated with Sotolongo (American Signature Homes and Omni One Financial), and Sotolongo would then funnel that money back to Musselwhite on behalf of the straw buyers to satisfy the straw buyers' deposit and cash-to-close obligations.

The allegations here involve the purchase of seven specific properties.

The Roger Matson Property

In late September 2006, Roger Matson agreed to purchase from Sotolongo a property located at 4249 South Atlantic Avenue for $2.35 million. Roger applied for a $1.88 million first-mortgage loan and a $237,085 second-mortgage loan from Washington Mutual Bank. In so doing, he overstated his income and assets, lied about his place of employment, and falsely stated that he would be using the home as his primary residence.

According to the HUD-1 settlement statement, Musselwhite closed the transaction on October 31, 2006. Washington Mutual, however, did not wire the loan proceeds to Orlando Title until November 2, 2006. Before that, on November 1, 2006, in anticipation of Washington Mutual's wiring of the loan proceeds to Orlando Title's account, Musselwhite disbursed a check from Orlando Title to

Sotolongo for $565,234, which Sotolongo then deposited into an account he jointly held with Steve Matson. On November 2, 2006, after Washington Mutual had wired the loan proceeds, Sotolongo transferred $470,209 from that account into Roger and Steve Matson's joint account. Roger Matson then wrote two checks, backdated to October 31, 2006, and made payable to Orlando Title, in the amounts of $212,665 and $50,000—the amounts reflected on the HUD-1 as the borrower's deposit and the cash to close. In this way and facilitated by Sotolongo and Musselwhite, Roger Matson used the loan proceeds to pay the borrower's deposit and the cash to close.

The Rifai Properties

Abdul Rifai, another of Sotolongo's straw purchasers, worked with Defendants-Appellants to purchase three properties: 15 Granville Circle, 397 Silver Beach Drive, and 1616 North Atlantic Avenue. Sotolongo made the arrangements for Rifai to "buy" 15 Granville Circle for $2.48 million.

When Rifai met with Mencis to fill out the loan application, Sotolongo accompanied Rifai. Rifai applied for a $1.98 million first-mortgage loan and a $250,479 second-mortgage loan from Washington Mutual and stated that he intended to occupy the property as his primary residence, even though that was untrue; in fact, he intended to use it as a rental property. Sotolongo reported that Rifai's car dealership made about $48,000 a month, a figure that Mencis used to

6

represent Rifai's income, even though Rifai made around $10,000 to $12,000 per month. The loan application also substantially overstated the funds in Rifai's SunTrust Bank accounts.

According to the HUD-1, Musselwhite closed the 15 Granville Circle transaction on March 30, 2007. That same day, Washington Mutual disbursed the loan monies to Orlando Title. Immediately, Musselwhite turned around and disbursed $579,982 via wire transfer to Sotolongo's company American Signature Homes. Also on that day, Sotolongo transferred $150,067 from the American Signature Homes bank account to one of his personal bank accounts and another $429,914 to Rifai's bank account.

The HUD-1 also stated that Rifai brought $222,000 to the closing in the form of personal checks. The personal checks were meant to cover the initial deposit and Rifai's cash-to-close obligations, and were provided to Musselwhite with the understanding that she would not deposit the checks until Sotolongo had first transferred the funds obtained through the Washington Mutual mortgage loan into Rifai's account.

As for the property located at 397 Silver Beach Drive, Rifai agreed to "purchase" it for $1.38 million. Rifai applied for a $1 million first-mortgage loan and a $161,805 second-mortgage loan from Wells Fargo. His loan application falsely stated that he intended to use the property as a primary residence. This loan

7

application, like the one for 15 Granville Circle, also falsely overstated Rifai's monthly income and his assets.

According to the HUD-1 settlement statement, Musselwhite closed this transaction on March 30, 2007. The HUD-1 stated that Rifai brought $129,436 to closing. Rifai provided Orlando Title with a personal check to cover this obligation at the closing, with the understanding that Musselwhite would not deposit it until Rifai had received funds from Sotolongo, which, in turn, Sotolongo was to obtain from the loan proceeds. But Musselwhite deposited the check too early, and it bounced.

Four days after the closing, Musselwhite disbursed to Sotolongo through American Signature Homes $339,971 via wire transfer from the mortgage-loan proceeds. The next day, April 5, 2007, Sotolongo transferred $100,395 from American Signature Homes to his personal bank account and another $239,575 to Rifai's bank account. Rifai then provided Musselwhite with an official SunTrust check for the $129,436 on April 10, 2007, which she deposited on April 12, 2007.

Finally, with respect to 1616 North Atlantic Avenue property, Rifai agreed to "purchase" it for $1.975 million. Rifai applied for a $1.3 million first-mortgage loan and a $396,912 second-mortgage loan from JPMorgan Chase Bank, falsely stating in the loan application that he intended to use the property as his primary residence and overstating his assets and monthly income.

8

According to the HUD-1 settlement statement, Musselwhite closed this transaction on April 20, 2007. The HUD-1 also reflected that Rifai brought $168,441 of his own funds to the closing. But, in fact, he did no such thing. Instead, on April 23, 2007, after the bank had disbursed the mortgage-loan proceeds to Orlando Title, Musselwhite disbursed $445,472 via wire transfer to American Signature Homes. Then, on April 25 and 26, Sotolongo transferred a total of $369,793 from American Signature Homes to Rifai's account. Rifai subsequently wrote two checks to Orlando Title—one for $168,441 and the other for $50,000—to cover his cash-to-close obligation and initial deposit. He backdated the checks to April 20, 2007, and Musselwhite did not deposit them until April 26, 2007.

### The Coton Properties

Sotolongo recruited Coton to participate in the scheme in early 2007, after he heard Coton bragging about his excellent credit rating. Coton was involved in the purchase of two beachfront properties: 2721 South Atlantic Avenue and 1006-1008 East 17th Avenue. Although Coton expressed reservations about buying such expensive properties, Sotolongo told him not to worry about it.

On April 4, 2007, Coton contracted to "purchase" 2721 South Atlantic Avenue for $2.48 million. Coton signed a blank loan application for a $1.98 million first-mortgage loan from Washington Mutual and a second-mortgage loan

9

for $246,389.  The loan application falsely stated that Coton intended to occupy the property as a primary residence, that he was self-employed, and that he earned $45,000 a month.  The loan application also substantially overstated the funds that Coton had in his bank accounts.

According to the HUD-1 settlement statement, Musselwhite closed the transaction on May 16, 2007.  The HUD-1 further reflected that Coton brought $244,078 to closing.  But, in fact, Coton brought no money to the closingAnd Musselwhite, who knew that Coton was a car salesman at the dealership, never asked him for the funds.

Instead, this transaction unfolded similarly to all of the others. On May 16, 2007, Musselwhite disbursed $529,998 via wire transfer to American Signature Homes.  The following day, Washington Mutual wired the loan proceeds to Orlando Title, and Sotolongo transferred $485,597 from American Signature Homes to Century Motors and $14,987 to his own personal account.  That same day, May 17, 2007, Rifai purchased cashier's checks drawn on the Century Motors account and made payable to Orlando Title to cover Coton's initial deposit and cash-to-close obligations.

Coton then contracted to "buy" the property located at 1006-1008 East 17th Avenue in June 2007 for $1.55 million.  Coton neither saw the property before he purchased it nor provided the funds for the initial deposit.  He applied for a loan

from Bank of America for $1.28 million to purchase the home purportedly as an investment property.  Once again, his loan application contained false representations about his employment, income, and assets.

According to the HUD-1 settlement statement, Musselwhite closed this loan on July 31, 2007.  As with the purchase of 2721 South Atlantic Avenue, Sotolongo directed Coton to just attend the closing and sign the documents.  When Coton showed up for the closing, Musselwhite did not ask him for any funds; she merely presented the documents to Coton for his signature.  On August 1, 2007, the day after Musselwhite received the loan proceeds from Bank of America, she disbursed $378,978 via wire transfer to American Signature Homes.  Two days later, on August 3, 2007, those funds in the American Signature Homes account were used to buy a bank check on behalf of Coton for $368,976—the amount specified on the HUD-1 as the borrower's cash to close.  Musselwhite deposited the check three days later.

The Goetz Property

Finally, Sotolongo learned of Goetz through Goetz's sister, who worked for Sotolongo.  Goetz, the owner and operator of a small carnival company in Pennsylvania, had expressed a desire to buy a property in Florida in the $200,000 range.  His sister suggested he instead purchase the property located at 120 Coral

11

Way for $1.4 million.   Goetz applied for a $980,000 first-mortgage loan from Washington Mutual Bank and a second-mortgage loan for $281,259.

Even though he made $60,000 per year, Goetz's loan application indicated that he made $35,000 per month.  According to the HUD-1 settlement statement, Musselwhite conducted a mail-away closing[6] on July 10, 2007, with a disbursement date of July 11, 2007.  Orlando Title received the loan funds from Washington Mutual Bank on July 12, 2007, and that same day, Musselwhite wired $310,514 to American Signature Homes.  She also disbursed an additional $99,971 to Omni One Financial on July 16, 2007.

Goetz was supposed to provide $146,325 in cash to close at the closing, but he did not (and did not know who did).  Instead, on July 17, 2007, Sotolongo used funds from the American Signature Homes account to purchase an official bank check made payable to Orlando Title for $166,325—the amount specified on the HUD-1 as the total amount due from Goetz at or before closing.  Goetz essentially acquired the property without paying a dime, which he described as being "too good to be true."

## B. Procedural History

Defendants Sotolongo and Musselwhite were indicted in April 2013, along with their co-conspirators Mencis and Garrett.  They were charged with numerous

---

[6] Specifically, Goetz testified that he did not attend a closing.  Rather, he was overnighted two or three packages containing documents, which he signed and returned.

offenses related to a mortgage-fraud scheme. Count 1 charged all four with having conspired, in violation of 18 U.S.C. § 371, to make false statements to FDIC-insured financial institutions, in violation of 18 U.S.C. § 1014, and to commit bank fraud, in violation of 18 U.S.C. § 1344. Counts 2 through 12 charged Musselwhite and Sotolongo with substantive executions of a bank-fraud scheme, in violation of § 1344. And Count 14 charged Musselwhite, Sotolongo, and Garrett with having made a false statement to Washington Mutual Bank, an FDIC-insured financial institution.[7]

Defendants' case traveled a winding road through the district court but ultimately was heard by visiting District Judge Jarvey. Defendants lodged various challenges along the way, contesting the transfer of their case from Judge Honeywell to Judge Dalton, Judge Dalton's subsequent recusal, and Judge Jarvey's adoption of Judge Dalton's orders, including Judge Dalton's denial of Defendant Sotolongo's proffered plea agreement. All challenges were denied.

Defendants then proceeded to trial. After ten days of trial, the jury returned a guilty verdict against Musselwhite on Counts 1, 4 through 12, and 14, and against Sotolongo on Counts 1 through 12. The jury acquitted Musselwhite on Counts 2 and 3 and Sotolongo on Count 14. The jury acquitted Garrett on all charges.

---

[7] Mencis, the only defendant charged in Count 13, pled guilty before trial.

After trial, Musselwhite and Sotolongo filed a joint motion for a new trial. The district court denied their motion. Defendants now appeal.

## II.    DISCUSSION

### A. Case Transfer and Recusal

On appeal, Sotolongo and Musselwhite complain about two issues related to the district court's procedures regarding judge assignment and recusal: (1) the district court's transfer of their case from Judge Honeywell to Judge Dalton; and (2) Judge Jarvey's refusal to vacate Judge Dalton's orders after Judge Dalton recused himself. We address both arguments in turn.

### 1. Case Transfer

The criminal complaint and indictment that form the basis of this appeal were filed on March 29, 2013, and April 24, 2013, respectively, and the case was eventually assigned to Judge Honeywell with case number 6:13-cr-99-Orl-36KRS. On October 21, 2013, the government filed an information separately charging Sidney Coton with having conspired to commit mortgage fraud. Coton's case was assigned to Judge Dalton, with case number 6:13-cr-261-Orl-37GJK. The next day, the government filed a notice in Coton's case alerting the court that Coton's case was related to the case previously filed against Defendants and pending before Judge Honeywell.

14

Coton's case proceeded independently from the case pending before Judge Honeywell. Coton pled guilty to count one of the information filed against him, and the court accepted his guilty plea and set sentencing for February 3, 2014. Then, on January 17, 2014, the government filed a motion—in Coton's case only—to consolidate the cases of Sotolongo, Musselwhite, and Coton. Judge Dalton granted the government's motion to consolidate and noted, "The Clerk is directed to reassign Case No. 6:13-cr-99-Orl-36KRS to the undersigned with Judge Honeywell's consent."

In response, Musselwhite and Sotolongo filed a motion to dismiss the indictment based upon what they perceived to be a purposeful decision by the government to circumvent the random assignment of judges by filing the motion to consolidate in only Coton's case, in alleged violation of Sotolongo and Musselwhite's due-process and equal-protection rights, and the local rules of the Middle District of Florida. The district court denied their motion, and Sotolongo and Musselwhite now appeal.

We review for an abuse of discretion a district court's denial of a motion to dismiss an indictment. *United States v. Seher*, 562 F.3d 1344, 1356 (11th Cir. 2009). Here, the district court did not abuse its considerable discretion. While Defendants insinuate that the government acted with bad intentions when it filed its motion to consolidate in Coton's case exclusively, we do not speculate as to

15

that[8] because "[d]istrict judges may by rule, order or consent transfer cases between themselves." *United States v. Stone*, 411 F.2d 597, 598 (5th Cir. 1969).[9] Here, Judge Dalton granted the government's motion to consolidate Defendant-Appellants' case with Coton's case "with Judge Honeywell's consent."

And while the local rule Defendants invoke does note that "a party may move to transfer any related case to a judge assigned to the first filed of the related cases," M.D. Fla. R. 1.04(b), that rule must be read in conjunction with Local Rules 1.03(d) and 1.01(c), which state, respectively, that "[t]he judge to whom any case is assigned may, at any time, reassign the case to any other consenting judge for any limited purpose or for all further purposes," and "[w]hen a judge of this Court . . . issues any order which is not consistent with these rules, such order shall constitute a suspension of the rules . . . ." M.D. Fla. R. 1.03(d); 1.04(b). So even though the district court's transfer of Defendants' earlier filed case to Judge Dalton appears to have been inconsistent with Local Rule 1.04(b), the transfer was nonetheless consistent with Local Rules 1.03(d) and 1.01(c) and constituted a permissible suspension of the rules, not a violation.

We therefore find no abuse of discretion in the district court's transfer of Defendants' earlier-filed case to Judge Dalton for consolidation with Coton's case.

---

[8] Nevertheless, at the very least, the government should have given Defendants timely notice of its filing of the motion in Coton's case.

[9] We have adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*2. Recusal*

Sotolongo and Musselwhite also challenge Judge Jarvey's failure to vacate and consider de novo motions ruled upon by Judge Dalton after Judge Dalton recused himself. We review de novo whether a recused judge's orders must be vacated. *United States v. Cerceda*, 172 F. 3d 806, 812 (11th Cir. 1999).

In order to understand this issue fully, we must detail the path this case traveled through the Middle District of Florida. After consolidating the cases of Sotolongo, Musselwhite, and Coton, Judge Dalton denied a number of motions Defendants filed, including a motion to extend pretrial deadlines, a motion to suppress, and a motion for a *James*[10] hearing. Shortly thereafter, following Defendants' filing of a notice urging Judge Dalton to recuse himself because of his prior service as a member of the Board of Directors of Seaside National Bank & Trust—a potential beneficiary of any restitution ordered to be paid by Defendants—Judge Dalton recused himself and directed the clerk of court to randomly reassign the case. The case eventually found its way to Judge Jarvey, of the Southern District of Iowa, who was temporarily presiding over cases in the Middle District of Florida.

Once the case was reassigned, Defendants filed a motion asking Judge Jarvey to vacate and reconsider anew the orders entered by the now-recused Judge

---

[10] *United States v. James*, 590 F.2d 575 (5th Cir. 1979), *abrogated in part by Bourjaily v. United States*, 483 U.S. 171, 178-79 (1987).

17

Dalton.   Judge Jarvey granted in part and denied in part Defendants' motion, noting that he had reconsidered the orders previously entered.   But instead of vacating the orders, Judge Jarvey adopted them as his own:

> This court has reviewed each of the orders at issue in this motion. Four of the first five orders are simply scheduling orders or briefing schedules. Dkt. No. 166 is simply a minute entry for proceedings held. The court has also reviewed the order rejecting a plea agreement, the order on the motion to suppress, the order on the motion to dismiss, and the order denying a pretrial hearing on the admissibility of so-called co-conspirator utterances. Upon the court's independent review of those motions and the orders, it finds each of these matters to have been correctly decided. This court could write additional opinions denying the motions to suppress, to dismiss and for a *James* hearing. However, this court's orders would not improve on the work that has already been done. Accordingly, rather than vacate the prior orders, the court simply chooses to adopt them as its own.

Defendants moved for reconsideration, which Judge Jarvey denied.

On appeal, Defendants raise many of the same arguments presented to the district court, including that all orders issued by Judge Dalton must be vacated because of his initial irregular assumption of jurisdiction over Defendant-Appellants' case.   In support, Defendant-Appellants rely upon *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), for the proposition that all case-dispositive rulings and subsidiary rulings on any case-dispositive matters must be vacated where recusal occurs in the latter stages of the case.   In seeking a return to

18

what they term the status quo, Defendants assert that the damage done by a judge with a financial conflict of interest can be remedied by only full vacatur and de novo review, without reliance upon any of the conflicted judge's discretionary and credibility rulings.

Though we agree that this case traveled an irregular path, we see no error in Judge Jarvey's decision to review the orders entered by Judge Dalton and subsequently adopt those orders as his own. This is so because once Judge Dalton recused himself, Judge Jarvey, a conflict-free judge, took over and considered de novo the motions and all orders entered by Judge Dalton. We know this because he told us so in his order adopting Judge Dalton's orders as his own.

The cases Defendants rely upon in support of their argument that Judge Jarvey was required to vacate all orders issued by Judge Dalton and consider the motions from scratch are inapposite as they speak to an altogether different set of circumstances. In *Liljeberg*, a judge *failed to recuse himself* in a case where he had a strong conflict of interest. Here, on the other hand, Judge Dalton recused himself as soon as he was made aware of his potential conflict of interest. So while vacatur of the entire proceedings presided over by a conflicted judge was the appropriate remedy in *Liljeberg*, the same cannot be said here where a conflict-free judge took over, reviewed the record and all prior rulings, and adopted them as his own. In fact, the Court in *Liljeberg* contemplated a solution like this when it noted that

19

ideally, the judge at issue should have recused himself as soon as he learned of his conflict so that a "different judge" could have stepped in "to decide whether the interests—and appearance—of justice would have been served by a retrial," 486 U.S. at 866. That is precisely what happened here.

And significantly, Defendants have not challenged Judge Jarvey's impartiality, nor have they challenged as legally erroneous any of the orders he adopted as his own. So we find no basis for reversing Defendants' convictions on this ground. Congress "wisely delegated to the judiciary the task of fashioning remedies" in the face of a judicial conflict of interest, *Liljeberg*, 486 U.S. at 862, and the remedy selected here avoided any appearance of impropriety. Judge Jarvey did not err in failing to take the procedural step of vacating Judge Dalton's orders, and any appearance of impropriety or loss of confidence in the impartiality of the judiciary was effectively cured when Judge Jarvey took over.

## B. Motion to Dismiss Indictment

Defendants also challenge the indictment, arguing that the government mischarged the offenses brought under 18 U.S.C. § 1344 in two related ways: (1) "the government merged a set of alleged schemes into one introductory paragraph, conflating the count 1 allegations of a conspiracy to commit multiple violations of § 1344 with the separate requirement imposed under the substantive statute to allege individual schemes capable of being fully executed," and (2) the

20

government "erroneously charged in a multiplicitous fashion multiple *executions* of the scheme."[11]

We review for abuse of discretion a court's denial of a motion to dismiss the indictment, although the legal sufficiency of the allegations in the indictment is a question of law that we review de novo. *United States v. York*, 428 F.3d 1325, 1332 n.8 (11th Cir. 2005).

> A person is guilty of bank fraud if he or she
>
> > knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344.

Subsection one "requires the Government to prove that the defendant (1) intentionally participated in a scheme or artifice to defraud another of money and property; and (2) that the victim of the scheme or artifice was an insured financial institution." *United States v. Goldsmith*, 109 F.3d 714, 715 (11th Cir. 1997). Subsection two "requires the Government to establish three elements: (1) that a scheme existed in order to obtain moneys, funds or credit in the custody of a

---

[11] The district court heard argument on Defendants' motion to dismiss at the close of the government's case but failed to issue a ruling. The district court's failure to rule on a motion "implicitly overruled appellants' objection." *United States v. Stefan*, 784 F.2d 1093, 1100 (11th Cir. 1986).

federally insured financial institution; (2) that the defendant participated in the scheme by means of false pretenses, representations or promises, which were material; and (3) that the defendant acted knowingly." *Id.*

"The unit of the offense created by § 1344 is each execution or attempted execution of the scheme to defraud, not each act in furtherance thereof. . . . [However,] a single scheme can be executed a number of times, and a defendant may be charged in separate counts for each execution of the scheme to defraud." *United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) (internal quotation marks and citations omitted). "[E]ach part of the scheme that creates a separate financial risk for the financial institution constitutes a separate execution" of the scheme. *See id.* at 1288.

Here, Counts 2 through 12 allege that beginning in January 2006, Defendants "knowingly and willfully devised . . . a scheme and artifice to defraud and to obtain money and property from FDIC-insured banks and mortgage lenders in connection with loans secured by mortgages on residential real property by means of false and fraudulent pretenses, representations and promises . . . ." The counts expressly incorporate the detailed introduction and manner and means section of Count 1 (the conspiracy count), including allegations that the pertinent banks were FDIC-insured and that the various false and fraudulent representations at issue were material to the banks' lending decisions. As for the execution of the

22

scheme, the indictment sets forth a table of eleven separate financial transactions, which make up Counts 2 through 12.

The indictment therefore alleges legally sufficient bank-fraud counts. Each of the elements of § 1344 is accounted for. Additionally, each of Counts 2 through 12 states a separate execution of the charged scheme. Each count listed in the table in the indictment notes the date and description of each specific execution of the mortgage-fraud scheme—that is, each count details a specific wire transfer of mortgage-loan proceeds from one of the victim banks to Orlando Title, and each transaction created a separate financial risk for the individual bank involved in making the loan. Because each count states a separate execution of the charged scheme, the charges are not multiplicitous. *See United States v. Sirang*, 70 F.3d 588, 595-96 (11th Cir. 1995) (upholding a conviction against a multiplicity challenge because "two transactions may have a common purpose but constitute separate executions of a scheme where each involves a new and independent obligation to be truthful"). And the district court did not err in denying Defendant-Appellants' motion to dismiss Counts 2 through 12 of the indictment.

## C. Plea Agreement

Defendant Sotolongo also challenges the district court's denial of his proffered plea agreement, asserting that the court encroached upon the executive branch's inherent power to prosecute or dismiss charges. We review for abuse of

23

discretion a district court's decision to reject a guilty plea. *United States v. Gamboa*, 166 F.3d 1327, 1330 n.2 (11th Cir. 1999).

Under his proffered plea agreement, Sotolongo agreed to plead guilty to one count of conspiracy to commit bank fraud in exchange for the dismissal of all remaining counts against him. The district court observed that the plea agreement would allow Sotolongo's sentence to be capped at five years when he was charged with other offenses for which he could have been sentenced to up to thirty years' imprisonment. The court found particularly troubling the sentencing disparity that could result from allowing Sotolongo to plead guilty to one count of conspiracy to commit bank fraud when his arguably less culpable co-conspirator, Mencis, had just pled guilty to one count of making a false statement to an FDIC-insured lending institution, which carried a thirty-year maximum term of imprisonment.

After reviewing the caselaw and the surrounding circumstances, we find no abuse of discretion in the district court's refusal to accept Sotolongo's proffered plea agreement. Under United States Sentencing Guidelines Manual ("U.S.S.G.") § 6B1.2(a), a district court maintains the discretion to accept a plea agreement "if the court determines . . . that the remaining charges adequately reflect the seriousness of the actual offense behavior." Here, the district court concluded that Sotolongo's proffered plea agreement did not "adequately reflect the seriousness of the actual offense behavior"—especially because Sotolongo, the ringleader of the

24

entire mortgage-fraud scheme, could serve a significantly lower sentence than his arguably less culpable co-conspirator, Mencis.  On this record, we cannot say that this was an abuse of discretion.  *See Gamboa*, 166 F.3d at 1330-31 (finding no abuse of discretion in the district court's denial of a plea agreement where a defendant charged with one count of conspiracy and three substantive drug charges, each carrying a minimum penalty of twenty years' imprisonment, attempted to plead guilty instead to a single count carrying a maximum possible penalty of four years' imprisonment).

## D. Lay-opinion Testimony

Defendants also appeal the district court's admission of what they deem to be improper lay-opinion testimony from bank employees who were identified only as records custodians.

We review for abuse of discretion a district court's evidentiary rulings. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007). And we review for clear abuse of discretion a district court's determination about the admissibility of lay-opinion testimony under Federal Rule of Evidence 701. *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011).  A district court abuses its discretion when its ruling is "manifestly erroneous."  *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004).  We will overturn an evidentiary ruling only if it resulted in a "substantial prejudicial effect."  *United States v.*

25

*Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004).  Unpreserved evidentiary objections are reviewed for plain error only.  *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007).

At trial, the government called a number of representatives from the four victim banks to testify about the mortgage-loan decision-making process at their respective banks.  These witnesses, including representatives from Bank of America, Wells Fargo, JPMorgan Chase, and Washington Mutual, testified as to each bank's standard practices concerning the loan-approval process and their mortgage-loan underwriting practices.  Defendants objected to the admission of the bank representatives' testimony on multiple grounds, including that the witnesses were not personally involved in making the lending decisions and that they were offering expert, rather than lay, opinions.

We consider first Defendants' argument that the government essentially hoodwinked them by identifying the bank representatives as records custodians but then eliciting from them fact-witness testimony.  Because Defendants failed to object to the testimony on this basis at trial, we review any alleged error for plain error only, and find no error here, plain or otherwise.  Trial judges maintain broad discretion in determining whether to admit evidence and witnesses not included in pretrial orders, and, as we have noted, Defendants did not object to this testimony,

26

giving the court no reason to believe that Defendants were somehow surprised by it. *Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir. 1980).

We next consider Defendants' argument concerning the alleged improper admission of lay-opinion testimony through the bank representatives. We have previously held that "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011). And where lay witnesses answer hypothetical questions "not . . . based on any scientific, technical or other specialized knowledge, but instead based . . . on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue," Rule 702 does not require that they be first qualified as an expert. *Id.* at 842 (internal quotation marks omitted). Here, this is especially the case because "it does not take any specialized or technical knowledge to realize that lending institutions would be reluctant to approve a loan application if they knew that it contained false statements about material facts." *Id.*

The district court did not abuse its discretion in allowing the bank representatives to testify as to their respective banks' mortgage-approval procedures and to answer hypothetical questions about whether their respective banks would have approved the loans had the banks known that the buyer's income, employment history, assets, earnest money deposit, and cash-to-close were

27

misrepresented.   The witnesses' testimony was properly characterized as lay-opinion testimony because they testified based upon "particularized knowledge gained from their own personal experiences."   The representative testifying on behalf of JPMorgan Chase had worked in the underwriting department for twenty-three years; the representative for Wells Fargo had been in the banking industry for twenty years; the representative for Bank of America was responsible for auditing loan files and had worked as an underwriter, loan processor, and funder; and the representative from Washington Mutual worked as a senior mortgage underwriter when the subject loans were approved.

## E. Preliminary Instructions

Defendants have two complaints about the district court's preliminary jury instructions: they assert that (1) the court erred in allowing jurors to hold onto physical copies of the preliminary instructions during the course of the trial without also including a good-faith instruction, and (2) the court erred in denying Defendants' motion for a mistrial after it became clear that the jurors were relying upon both the preliminary and final jury instructions during their deliberations.

We review for abuse of discretion a district court's provision of written instructions to the jury.  *United States v. Holman*, 680 F.2d 1340, 1354 (11th Cir. 1982).  We also review for abuse of discretion a district court's refusal to give a requested jury instruction.  *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir.

28

2006). Such a refusal is reversible error only if the requested instruction "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." *United States v. Westry*, 524 F.3d 1198, 1216 (11th Cir. 2008) (per curiam) (internal quotation marks omitted).

Finally, we review for abuse of discretion a district court's refusal to grant a mistrial. *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007). "[A] trial judge has discretion to grant a mistrial since he is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *Id.* at 1227.

We first address Defendants' assertion that the district court erred when it gave jurors written copies of the preliminary jury instructions for use throughout trial—an error that Defendants argue was magnified by the district court's refusal to also include a preliminary good-faith instruction.

After trial began and the jury was impaneled, the district court provided each juror with a copy of the preliminary jury instructions. The court instructed the jurors that the instructions were preliminary and that they would receive more detailed instructions at the end of trial. It also cautioned the jurors against engaging in premature deliberations. Finally, the court's instructions included one

29

outlining the elements of the offenses charged in the indictment. Defendants did not object to the preliminary instructions as they were being read to the jurors.

Once the jury had been excused for the day, however, Defendants objected to the jurors' maintenance of the preliminary instructions in their possession during the duration of the trial, arguing that the instructions were incomplete and misleading. The district court overruled Defendants' objection, opining that the complexity of the case and number of the counts charged in the indictment necessitated written instructions that the jury could reference during trial. In response, Defendants requested that the preliminary instructions also include a good-faith instruction, which request the court denied as untimely.

We find no abuse of discretion in the district court's decision to allow jurors to keep written copies of the preliminary jury instructions during the duration of the trial. We first note that, though rare, a district court is not prohibited from giving jurors written copies of its preliminary jury instructions, especially in complex cases. As provided for in the Federal Rules of Criminal Procedure, a trial judge maintains the inherent authority to manage a trial and to give jury instructions at any time they are needed before, during, or after a trial. *See* Fed. R. Crim. P. 57(b) ("A judge may regulate practice [in criminal cases] in any manner consistent with federal law, these rules, and local rules of the district."); Fed. R.

30

Crim. P. 30(c) ("The court may instruct the jury before or after the arguments are completed, or at both times.").

Nor can we say on this record that the district court abused its discretion when it denied Defendants' request to include a good-faith instruction in the preliminary jury instructions. While we may have decided differently, the district court's denial of Defendants' request did not reach the level of an abuse of discretion. And because a good-faith instruction was included in the final jury instructions, the failure to include such an instruction in the preliminary instructions did not satisfy the standard of impairing Defendants' ability to present an effective defense.

We next address Defendants' contention that the district court erred by allowing jurors to keep both the preliminary and final jury instructions during deliberations. At the conclusion of the trial, the district court gave jurors written copies of the final jury instructions, but it did not collect from them their copies of the preliminary jury instructions. The court stressed, however, that the jurors were to rely upon the final jury instructions in their deliberations.

On their second day of deliberations, the jurors submitted a question about a difference in wording between the preliminary and final jury instructions in the instruction for Count 14. In response, Defendants moved for a mistrial, arguing that it was now clear that the jurors were using two sets of instructions in

31

attempting to decide the case. The court denied Defendants' motion, instructed the jurors to "use the final instructions in their totality," and collected the jurors' copies of the preliminary jury instructions.

On appeal, Defendants assert that any error resulting from the provision of copies of the preliminary jury instructions to the jurors was not harmless because after the court responded to the jury's question regarding Count 14, the jury returned its verdict within thirty minutes. Defendants interpret this fact to mean that the jurors improperly relied upon the preliminary jury instructions in deciding Counts 1 through 12 and properly utilized the final jury instructions only in deciding Count 14, the one count for which the jury found Sotolongo not guilty.

While the court should have collected the copies of the preliminary jury instructions before distributing the final jury instructions, on this record, we cannot find abuse of discretion in the district court's denial of Defendants' motion for a mistrial. Here, the court did instruct the jurors to rely upon the final jury instructions during its deliberations, and it reiterated that sentiment in response to the jurors' question. We presume that a jury follows its instructions and understands a judge's answer to its question. *Week v. Angelone*, 528 U.S. 225, 234 (2000). Therefore, any error was harmless.

32

## F. Theory-of-Defense Instruction

Musselwhite argues that the district court abused its discretion when it refused to give her proffered theory-of-defense jury instruction. As we have noted, we review for abuse of discretion a district court's refusal to give a requested theory-of-defense instruction. *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999).

The court provided jurors with the following good-faith instruction:

> Good faith is a complete defense to the charges in the indictment since good faith on the part of the Defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges. The burden of proof is not on a Defendant to prove good faith, or course, since a Defendant has no burden to prove anything. The Government must establish beyond a reasonable doubt that a Defendant acted with specific intent to defraud as charged in the indictment.
>
> One who expresses an honestly held opinion, or an honestly formed belief, is not chargeable with fraudulent intent even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.
>
> On the other hand, an honest belief on the part of a Defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as that term is used in these instructions if, in carrying out that venture, a Defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

33

In addition to this instruction, Musselwhite requested a separate instruction that stated, in part, "Stephanie Musselwhite acted in Good Faith during all times in each of the seven transactions in this case. Additionally, Stephanie Musselwhite contends that the United States has failed to prove beyond a reasonable doubt that Stephanie Musselwhite knowingly, intentionally and willfully committed any of the offenses for which she is charged in the indictment."

Because Musselwhite's requested instruction was "adequately covered in the [good faith] instruction given to the jury," the district court did not abuse its discretion in refusing to give it. By its own terms, Musselwhite's proffered instruction was premised on the defense that she "acted in Good Faith during all times in each of the seven transactions in this case." And the district court gave an instruction to that effect; the jury had to acquit if they found that Musselwhite did not act with a specific intent to defraud. So we find no error here.

## G. Juror Dress Code

Defendants next argue that this case should be remanded so they may further investigate their claim that prospective jurors were dismissed because of dress-code violations. Defendants first raised this argument in their motion for a new trial, asserting that on the first day of trial, court security officers denied a number of prospective jurors entry to the courthouse because they were not dressed in compliance with the Middle District of Florida's juror dress code. In making this

34

argument, Defendants rely upon the affidavit of a private investigator, who attested that on the first day of trial, he observed a white male and a black male being denied entry into the courthouse.

As we have noted, we review for abuse of discretion a district court's denial of a motion for a new trial. *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005).

The district court held a hearing on Defendants' motion and then denied it, relying in part on records maintained by the clerk of court. The district court noted that on the first day of trial, 98 jurors were summoned and 96 were checked in. There were two no-shows—both of whom identified as white on their juror questionnaires—and three jurors who were tardy. These tardy jurors were checked in but showed up too late to participate in the proceedings. Of the three tardy jurors, two also happened to be in violation of the dress code. Additionally, five people were excused by the clerk's office during the jury-orientation process; one was over seventy years old, another had just experienced a death in the family, one's vehicle had broken down, one had a prepaid course to attend, and the last did not speak or understand English.

With this in mind, we find no abuse of discretion in the district court's denial of Defendants' request to reopen proceedings for further investigation of their juror dress-code allegations. Based upon the records provided by the clerk of court, no

35

juror was, in fact, excluded based upon dress-code violations. While the clerk's office did opine that two of the three tardy jurors were inappropriately dressed, that is not the reason they were excused. Contrary to the investigator's observations, it is clear that these jurors made it past security and into the jury room. It was only after the district judges empaneling juries that day indicated that they did not need any further jurors that the tardy jurors were released for the day.

We therefore find no basis to remand this case for further investigation of the juror dress-code issue raised.

## H. Sufficiency of the Evidence

Finally, Musselwhite challenges the sufficiency of the government's evidence to sustain her convictions for conspiracy to commit bank fraud, substantive bank fraud, and making false statements to an FDIC-insured bank.[12] Essentially, she argues that the government failed to establish that she was a knowing and willful participant in the alleged mortgage-fraud conspiracy or that she acted with the requisite intent to defraud the lenders. After thorough review, we affirm each of her convictions.

We review de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences

---

[12] Sotolongo purports to adopt Musselwhite's arguments concerning the sufficiency of the evidence. Sufficiency arguments, however, "are too individualized to be generally adopted." *United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000). We therefore decline to consider the sufficiency of the evidence with regard to Sotolongo.

36

and credibility choices in favor of the jury's verdict. *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). An appellant must do more than "put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006). Thus, we may not overturn a jury verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013).

Count 1 of the indictment charged Musselwhite with conspiracy to violate two different federal statutes—knowingly making false statements for the purpose of influencing the actions of federally insured banks, in violation of 18 U.S.C. § 1014, and bank fraud, in violation of 18 U.S.C. § 1344. Counts 2 through 12 and Count 14 charged Musselwhite with the substantive crimes of bank fraud and making false statements to an FDIC-insured bank.

The elements for proving a conspiracy under 18 U.S.C. § 371 are as follows: "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). But a defendant need not know "all of the details" of the conspiracy. *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015).

37

Rather, the government must prove that she knew of the conspiracy's "essential nature" and joined it. *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005). Because conspiracies are "predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove [their] elements," including "inferences [drawn] from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (internal quotation marks and citation omitted).

A conviction for bank fraud under 18 U.S.C. § 1344 requires proof beyond a reasonable doubt that (1) a scheme existed to obtain money in the custody of a federally insured bank by fraud; (2) the defendant participated in the scheme by means of material false pretenses, representations or promises; and (3) the defendant acted knowingly. 18 U.S.C. § 1344; *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002) (citing *Goldsmith*, 109 F.3d at 715). As with conspiracy, "circumstantial evidence may prove [a defendant's] knowledge." *United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004).

And finally, to establish a violation of 18 U.S.C. § 1014, the government "must demonstrate (1) that the defendant made a false statement or report, . . . and (2) that [s]he did so for the purpose of influencing in any way the action of [the financial institution] upon any application, advance, . . . commitment, or loan."

38

*Williams v. United States*, 458 U.S. 279, 284 (1982) (internal quotation marks omitted and fourth alternation in original).

Here, the government sufficiently demonstrated that Musselwhite was a knowing and willful participant in the mortgage-fraud conspiracy. The indictment itself alleged a broad conspiracy with numerous objectives, including improperly disbursing loan proceeds and submitting fraudulent HUD-1 statements. Because the indictment alleged a conspiracy with multiple objectives, the government was not required to prove that Musselwhite knew of and furthered each one. "A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects." *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997). This means that the government was not necessarily required to show that Musselwhite knew that the loan applications themselves were fraudulent as long as it demonstrated that she knew of, and voluntarily participated in, an agreement to improperly disburse loan proceeds and falsify closing documents.

The government more than met its burden. The evidence introduced at trial revealed that Musselwhite prepared and signed HUD-1 settlement statements attesting that the closing had been conducted as required and that all conditions precedent had been met. Though Musselwhite affirmed that the representations in the settlement statements were a "true and accurate account of [the] transaction,"

39

this was plainly false. Musselwhite improperly disbursed loan proceeds on several different occasions. She attested that the loans closed as scheduled, which included a representation that the borrower had made his required cash-to-close payment, all the while knowing full well that she had not in fact received any cash to close from the borrowers. She then funneled the loan money received from the lenders to her co-conspirators, who then returned a portion of the loan money to her, in the name of the straw buyer, to satisfy a cash-to-close obligation that Musselwhite had affirmed had already been satisfied.

For these same reasons, we find that the government introduced more than sufficient evidence for a jury to have reasonably found Musselwhite guilty of bank fraud and making false statements. The government presented evidence of the importance to the lenders of the information provided by the closing agent in the settlement documents. Specifically, the government put on evidence that lenders might have altered their lending decisions had they known, for example, that the straw purchasers were not in fact personally providing their own down payments and cash-to-close sums.

The government also introduced sufficient evidence for a jury to conclude that Musselwhite was aware of, and knowingly participated in, the scheme to submit fraudulent loan applications. The transactions at issue all involved the same cast of characters: Sotolongo, Mencis, and a rotating group of straw

40

purchasers.    And for transactions involving these individuals, Musselwhite engaged in the same behavior:  the straw buyers provided her with down payments, which she did not deposit.    She then closed each transaction and improperly released loan proceeds to Sotolongo, who then funneled a portion of the loan proceeds back to the straw buyer for fraudulent use as the down payment on the property.    That Musselwhite followed virtually the same pattern in all of the transactions at issue—immediately transferring mortgage proceeds to Sotolongo's companies and waiting to deposit the buyers' checks—is highly suggestive of her knowledge of the scheme.

Musselwhite veered from this practice in a few transactions involving straw-purchaser Rifai and properties located at 15 Granville Circle and 397 Silver Beach Drive.    But that fact does not help Musselwhite.    Rifai testified that he provided Musselwhite with personal checks to cover his deposit and cash-to-close obligations, with the understanding that she would not deposit the checks until Sotolongo had deposited the lender's funds in his account.    Musselwhite deposited Rifai's checks before closing, and they bounced.    He testified that he confronted Musselwhite about the problem, and the issue was resolved.    Significantly, Rifai noted that Musselwhite was aware of the arrangement and confirmed that she would endeavor to deposit his checks only after he had received the funds from Sotolongo.

41

Viewing this evidence in the light most favorable to the verdict and drawing all inferences in the government's favor, ample evidence demonstrates Musselwhite's knowledge of the essential nature of the unlawful scheme and her willing participation within the conspiracy. She knew that the straw buyers were not qualified to purchase the properties and that they did not make the required down payments nor meet the required cash-to-close obligations with their own money. Yet she nonetheless closed the transactions, sometimes without the buyer even being present at the closing, and facilitated the fraudulent use of loan funds for down payments.

As for the substantive counts (Counts 2 through 12 and Count 14), the evidence presented at trial likewise was sufficient for a jury to find beyond a reasonable doubt that Musselwhite acted knowingly and with the intent to defraud. Musselwhite laments the government's reliance upon testimony from witnesses looking to gain more favorable deals in their own criminal cases, but as we have previously noted, the jury is free to choose among reasonable constructions of the evidence, and we must accept a jury's inferences and determinations of witness credibility. *Williams*, 390 F.3d at 1323.

Nor, as Musselwhite suggests, does the contention that she did not participate in or know all of the elements of the scheme negate her guilt because a "culpable aider and abetter need not perform the substantive offense, need not fully

42

know of its details, and need not even be present." *United States v. Hernando Ospina*, 798 F.2d 1570, 1581 (11th Cir. 1986) (citation and quotation marks omitted).

In short, we cannot say that no "reasonable construction of the evidence would have allowed the jury to find [Musselwhite] guilty beyond a reasonable doubt." *Rodriguez*, 732 F.3d at 1303. And so the district court did not err in denying Musselwhite's motion for judgment of acquittal.

### III.   CONCLUSION

For the reasons stated, we **AFFIRM** the convictions of James Sotolongo and Stephanie Musselwhite.

**AFFIRMED.**

43